IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>KENNETH JOHN DAVID SCHNEIDERS,<br><br>    Defendant. | Case No. 20-CR-4032-LTS-KEM<br><br>**REPORT AND RECOMMENDATION** |

Defendant Kenneth John David Schneiders moves to suppress evidence seized from his person after law enforcement detained and searched him based on information from a confidential source ("CS"). Doc. 24. The Government resists. Doc. 40. I recommend **denying** the motion to suppress.

### I.     BACKGROUND[1]

The CS contacted Drug Enforcement Agency Task Force Officer Ben Gill near the end of November 2019, indicating that a third party, who the CS named, wanted to sell ounce quantities of methamphetamine to the CS. The CS had previously provided reliable information to Officer Gill. On December 2, the CS contacted Officer Gill again, indicating that the third party wanted to meet in Sioux City to sell five to six ounces of methamphetamine to the CS for $3000.

---

[1] The facts in the background section are mostly taken from the testimony at the suppression hearing, the dash cam videos, and the exhibits containing the CS's messages, Doc. 39-7 and Doc. 43-3.

At 5:00 p.m., the third party texted the CS to meet him at the bar at 23rd and Court Street. There are no bars in that precise location, although there are several bars in the 2100 block of Court Street. Officer Gill went to 23rd and Court Street and parked in the parking lot for the Boys and Girls Home (which spans several blocks such that it has an address in the 2100 block, but its parking lot is near 23rd Street). After Officer Gill had parked at the Boys and Girls home, two stalls away from a red van, the third party texted the CS to go to the Boys and Girls Home and look for a "red van" with a "fat guy in it," indicating he had "everything." Officer Gill took note of the van's location, its Nebraska plates, and that a driver and passenger were in the van, and he left the Boys and Girls Home parking lot (but remained in the area).

The CS received a message via Facebook from Schneiders, who the CS had never met before. Schneiders asked where the CS was. The CS responded by asking who Schneiders was, and Schneiders responded he was the third party's friend. The CS asked whether they were meeting, and Schneiders said yes. He told the CS he was at the Boys and Girls Home. When the CS asked Schneiders to meet at Walmart instead, Schneiders said he was on foot, but a friend was letting him "stay warm in his car." Schneiders sent a picture of the Boys and Girls Home as seen through the windshield of the vehicle. He also sent a picture of the empty driver's seat, stating that the friend was not with him, and a "selfie" picture of his face.[2] Schneiders complained about the length of time it was taking the CS to arrive, saying "If u don't want them I'm coo with it. I got a few others rn that need. I just am sick of [the third party] talking shit saying I never help him out."

Throughout, the CS kept Officer Gill updated on messages received from the third party and Schneiders, calling Officer Gill and sending screenshots of the messages. When

---

[2] Officer Gill testified at the suppression hearing that the picture of Schneiders's face shown in Exhibit 4 is hard to see, but that when viewed on his computer it does in fact show Schneiders. It appears Officer Gill did not know what Schneiders looked like prior to the other officers approaching the red van.

2

the CS sent Officer Gill the picture from Schneiders of the Boys and Girls Home, Officer Gill confirmed that the angle of the picture was consistent with being taken from the red van he had previously identified. In the picture of the empty driver's seat, a white SUV was visible through the driver's side window—consistent with the white SUV parked two spaces away from the red van Officer Gill had observed earlier.

Officer Gill instructed uniformed officers in the area to approach Schneiders in the van, including Sioux City Police Detective (and at that time K-9 handler) Paul Yaneff. Detective Yaneff recognized Schneiders's name—he knew what he looked like and that he lived a few blocks away from the Boys and Girls Home, and he had heard from other officers that Schneiders was a methamphetamine user and dealer. Detective Yaneff arrived on the scene first, quickly followed by three other officers. Detective Yaneff told Schneiders that there had been a report of a suspicious vehicle, and he asked Schneiders, who was sitting in the passenger seat, to step out of the van. He asked Schneiders what he was doing, and Schneiders indicated he was waiting for a friend to finish a domestic violence class at the Boys and Girls Home. Detective Yaneff asked if there was anything in the van he needed to be aware of, and Schneiders told him that it was not his vehicle, and belonged to his friend in the domestic violence class. Detective Yaneff asked Schneiders if he had any weapons on him, like pocketknives, which Schneiders denied. When Detective Yaneff asked if he could conduct a pat-down search to confirm, Schneiders refused. Detective Yaneff again asked if there was anything in the vehicle, and Schneiders said not to his knowledge. Detective Yaneff then asked Schneiders about drug use, and Schneiders indicated he had last used methamphetamine in January. Detective Yaneff told Schneiders he was going to run his K-9 Cash around the vehicle, and if Cash alerted, he would have probable cause to search Schneiders. The drug dog sniff of the van occurred within three minutes of Detective Yaneff's first contact with Schneiders. The drug dog alerted on the passenger side front door.

3

During the K-9 sniff, Schneiders, who was standing in front of a nearby patrol vehicle, called his mother, and he was still on the phone after the dog's alert. When he finished the phone call, officers handcuffed him after a bit of resistance. They took the cell phone from his hand and placed it on the hood of a patrol vehicle. They searched his person, discovered a methamphetamine pipe, and read him his *Miranda* rights. Then, they searched the van and discovered two ounces of methamphetamine behind the passenger seat. At the end of the encounter, they let Schneiders go and did not take him into custody, although they kept the phone, pipe, and methamphetamine (and eventually obtained a warrant to search the phone three months later).

Schneiders moves to suppress evidence obtained as a result of his detention and the search of his person on December 2. I held a hearing on the suppression motion on October 21, 2020. Doc. 45. At the hearing, Officer Gill and Detective Yaneff testified. I also admitted the following exhibits into evidence under seal:

- Defendant's Exhibit A-1 through A-3 (dash cam videos of the December 2 encounter);
- Defendant's Exhibits B-1 through B-6 (police reports) (Docs. 39-1 to 39-6);
- Defendant's Exhibit C (pictures obtained at a later date of the text messages between the CS and the third party on December 2) (Doc. 39-7);
- Defendant's Exhibit D (picture of the pipe seized from Schneiders's person) (Doc. 39-8);
- Government's Exhibit 4 (pictures obtained at a later date of the Facebook messages between the CS and Schneiders on December 2) (Doc. 43-3); and
- Government's Exhibits 1, 2, 3, 5, and 6 (duplicates of Defendant's exhibits).

## II. DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." **U.S. Const. amend. IV**. Schneiders challenges his initial detention, his extended detention, and the search of his person after the K-9 alert, arguing that he was subject to an unreasonable search and seizure in violation of the Fourth Amendment.

4

*A. Seizure*

The parties agree that Schneiders was seized within the meaning of the Fourth Amendment when law enforcement approached the red van to talk to Schneiders and ordered him out of the van. The Fourth Amendment permits an officer to "briefly detain a person while the officer investigates his reasonable suspicion that criminal activity is afoot." *United States v. Davis*, 202 F.3d 1060, 1062 (8th Cir. 2000). "To establish reasonable suspicion, 'the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' further investigation." *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). Reasonable suspicion requires "some minimal level of objective justification" of criminal activity that is "more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal quotation marks omitted) (quoting *INS v. Delgado*, 466 U.S. 210, 217 (1984); *Terry*, 392 U.S. at 27). "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002). The officer "need not rule out the possibility of innocent conduct." *Id.* at 277. Courts must consider "the totality of the circumstances," rather than analyzing the suspiciousness of each factor in isolation. *Id.* at 274, 277.

Here, reasonable suspicion existed that Schneiders was in the Boys and Girls Home parking lot to sell methamphetamine based on the information from the CS. Schneiders does not seriously argue otherwise; instead, he suggests that the information from the CS should not be considered because Detective Yaneff told Schneiders he stopped him based on a report of a suspicious vehicle. That Detective Yaneff did not tell Schneiders about the CS (to protect the CS) does not mean the information from the CS should not be considered in the reasonable-suspicion analysis. *Cf. United States v. Demilia*, 771 F.3d 1051, 1054 (8th Cir. 2014) ("In *Devenpeck v. Alford*, [543 U.S. 146, 153-56 (2004),]

5

the Supreme Court examined probable cause in the context of an arrest and held that even if an officer invokes the wrong offense at the time of an arrest, probable cause for the arrest still exists as long as the facts known to the officer would provide probable cause to arrest for the violation of some other law."). Detective Yaneff knew about the potential drug deal from Officer Gill, and under the collective-knowledge doctrine, the court can consider what both officers knew in determining whether reasonable suspicion existed. *United States v. Gillette*, 245 F.3d 1032, 1034 (8th Cir. 2001) ("Under [the collective-knowledge doctrine], the validity of a search [or seizure] 'may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if some degree of communication exists between them.'" (cleaned up) (quoting *United States v. Gonzales*, 220 F.3d 922, 925 (8th Cir. 2000)). I recommend finding that reasonable suspicion existed to stop Schneiders and investigate the potential drug deal.[3]

Schneiders argues that officers unreasonably prolonged the stop to conduct the dog sniff, relying on *Rodriguez v. United States*, 575 U.S. 348 (2015). But here, unlike in *Rodriguez*, the purpose of the initial stop was to investigate drug activity. *See id.* at 351. Officers did not prolong the stop—which lasted only three minutes before the K-9 sniff—by asking Schneiders about what he was doing in the Boys and Girls Home parking lot, his drug use, and whether anything illegal was in the car. Investigating Schneiders for potential drug activity in the parking lot was the purpose of the stop. Schneiders argues that because officers did not inform him about the information learned from the CS, they did not attempt to "dispel" their suspicions. But the officers could instead investigate, consistent with the purpose of the initial stop, by asking Schneiders about drug activity and by running a K-9 around the vehicle. *See United States v. Mosley*, 878 F.3d 246, 253 (8th Cir. 2017) (holding that the length of an investigative stop "remains lawful" as

---

[3] I also find it likely that probable cause for the stop existed, as the Government argues, but I need not rule definitively on this issue.

"long as *unrelated* inquiries do not measurably extend the duration of the stop" (cleaned up) (emphasis added) (quoting ***Rodriguez***, 575 U.S. at 355)). I recommend finding that the length of the stop prior to the K-9 sniff did not violate the Fourth Amendment.

### *B. Search*

The parties agree that the search of Schneiders's person after the K-9 alert was not a *Terry* pat-down and that it needed to be supported by probable cause. "Probable cause exists . . . if the totality of the circumstances known to the officers involved is 'sufficient to warrant a prudent person's belief that the suspect had committed or was committing an offense.'" ***United States v. Chartier***, 772 F.3d 539, 545 (8th Cir. 2014) (quoting ***United States v. Mendoza***, 421 F.3d 663, 667 (8th Cir. 2005)). "A dog sniff by a reliable drug dog that results in an alert on a vehicle gives an officer probable cause to believe there are drugs present." ***Id.***

Schneiders argues that although K-9 Cash's alert provided probable cause that there were drugs in the red van, it did not provide probable cause that Schneiders himself possessed drugs. The Government, on the other hand, ignores the positive K-9 alert and argues that the information from the CS, standing alone, establishes probable cause that Schneiders possessed drugs. Both parties forget that probable cause is based on the totality of the circumstances. Here, officers had information from a reliable CS that Schneiders was waiting in the red van in the Boys and Girls Home parking lot to sell methamphetamine to the CS, the officers had corroborated much of that information, and a drug dog sniff resulted in a positive alert on the front passenger side of the red van, where Schneiders had been sitting three minutes earlier. Under these circumstances, there was probable cause to believe that Schneiders "possessed, or had possessed, illegal

7

drugs" with the intent to sell, whether those drugs were currently in the van or on Schneiders's person. *Chartier*, 772 F.3d at 545.[4]

The closer issue is whether the search-incident-to-arrest exception to the warrant requirement applies, as the Government argues. "Under the Fourth Amendment, 'a warrantless search of the person is reasonable only if it falls within a recognized exception' to the warrant requirement." *Id.* (quoting *Missouri v. McNeely*, 569 U.S. 141, 148 (2013)). The search-incident-to-arrest exception allows the "search of the arrestee's person to remove weapons and seize evidence to prevent its concealment or destruction." *Id.* The Eighth Circuit has upheld the warrantless search of a person under the search-incident-to-arrest exception when the person was not formally arrested at the time of the search, but "probable cause for arrest existed . . . before the search," and "formal arrest followed quickly on the heels of the challenged search of [defendant's] person." *Id.* at 546.

But here, although officers had probable cause to arrest Schneiders, they did not arrest him—he was handcuffed for less than an hour while the officers searched his person and the red van, and at the end of the encounter, he was allowed to go home. Schneiders was not formally arrested until six months later, when he was indicted on the current charges. The Government argues that when Schneiders was handcuffed, it amounted to a formal arrest. The Government relies on *United States v. Pratt*, 355 F.3d 1119 (8th Cir. 2004). In that case, law enforcement observed defendant walking on the street when sidewalks were available, a violation of state law. *Id.* at 1120. Law enforcement were familiar with defendant from past encounters, and they saw him spit something from the

---

[4] Schneiders relies on *Chartier* to argue that a search of the van needed to first reveal the absence of drugs before officers would have probable cause that Schneiders possessed drugs on his person. *See* 772 F.3d at 545. But in *Chartier*, the initial traffic stop was based on reasonable suspicion that the driver of the vehicle did not have a valid license, and the officer did not have any prior information connecting the defendant to drug activity, as here. *See id.* at 542-43.

8

side of his mouth, which they believed to be crack cocaine based on defendant's similar behavior in the past. *Id.* at 1120. They stopped defendant and conducted what they thought of as a *Terry* pat-down, which revealed ammunition that defendant, as a felon, was barred from possessing. *Id.* at 1121, 1124. They took defendant into custody, placing him "under what the officers termed an 'investigation arrest' for possessing ammunition," and also gave the defendant a ticket for walking in the street. *Id.* at 1121. The defendant argued that the officers lacked reasonable suspicion to conduct the *Terry* pat-down. Rather than address that issue, the court upheld the search as incident to arrest on the sidewalk violation. *Id.* The court noted that even though the officers did not subjectively believe they had arrested the defendant at the time of the search, "when probable cause to arrest exists, the standard for determining whether an arrest has occurred is the same as that for determining whether a seizure has occurred." *Id.* at 1124. The Government relies on this language to argue that an arrest occurred here, but it was undisputed in *Pratt* that the officers arrested the defendant—the issue was one of timing. *See also* **Sibron v. New York**, 392 U.S. 40, 48-49, 67 (1968) (case cited by the Eighth Circuit as support for the language the Government now relies upon). As already discussed, a search incident to arrest can occur before formal arrest, but *Pratt* does not support that it can occur without a formal arrest altogether. To read *Pratt* as the Government contends would allow an officer to eschew the warrant requirement any time probable cause existed that a person was involved in criminal activity, simply by waiting for the person to enter a public space, stop them, search them, and allow them to go on their way. *Pratt* does not upend the general rule that a search incident to arrest be "roughly contemporaneous with the arrest." **United States v. Hrasky**, 453 F.3d 1099, 1101 (8th Cir. 2006) (quoting **United States v. McLaughlin**, 170 F.3d 889, 891-92 (9th Cir. 1999)), *abrogated by* **Arizona v. Gant**, 556 U.S. 332 (2009).[5]

---

[5] *Hrasky* upheld the search of a vehicle incident to the driver's arrest for a traffic violation, a holding abrogated by *Gant*, but *Gant* does not call into question the analysis in *Hrasky* related to

In *Cupp v. Murphy*, 412 U.S. 291 (1973), the Supreme Court discussed the search-incident-to-arrest exception in the absence of a formal arrest the day of the search. In that case, while questioning the defendant about the murder of his wife, law enforcement noticed a dark spot underneath his fingernails that they suspected to be dried blood. *Id.* at 292. They took a sample of his fingernail scrapings over his objection. *Id.* Although they had probable cause to arrest him for murder at the time of the fingernail search, he was released at the end of the encounter and not formally arrested until a month later. *Id.* at 293-94. The Supreme Court upheld the fingernail search as a search incident to arrest, reasoning:

> Where there is no formal arrest, as in the case before us, a person might well be less hostile to the police and less likely to take conspicuous, immediate steps to destroy incriminating evidence on his person. Since he knows he is going to be released, he might be likely instead to be concerned with diverting attention away from himself. Accordingly, we do not hold that a full *Chimel*[6] search would have been justified in this case without a formal arrest and without a warrant. But the respondent was not subjected to such a search.

---

the length of time between the arrest and the search.

Schneiders relies on *Knowles v. Iowa*, 525 U.S. 113 (1998), but I find it does not address the issue presented here. In *Knowles*, the defendant was issued a citation for speeding, not arrested, prior to a search of his vehicle. *Id.* at 114. The defendant was arrested based on the evidence seized during the vehicle search. *Id.* Although state law permitted arrest for minor traffic violations such as speeding, the Supreme Court declined to extend the search-incident-to-arrest exception to situations where an officer issued a traffic citation rather than arresting an individual where concern for neither officer safety nor destruction of evidence applied. *Id.* at 116-19. Eleven years later, in *Gant*, the Court relied on the reasoning of *Knowles* to hold that even when the defendant was actually arrested for a traffic violation, the search-incident-to-arrest exception did not permit search of the defendant's car, because "police could not reasonably have believed . . . evidence of the offense for which he was arrested might have been found therein." 556 U.S. at 344. Neither *Knowles* nor *Gant* involved the search of a person. The reasoning in *Gant*, however, perhaps calls the Eighth Circuit's holding in *Pratt* into question, *see, e.g.*, 355 F.3d at 1124 n.4; an issue I need not decide as I have already found *Pratt* distinguishable.

[6] The seminal search-incident-to-arrest case, *Chimel v. California*, 395 U.S. 752 (1969).

> At the time [the defendant] was being detained at the station house, he was obviously aware of the detectives' suspicions. Though he did not have the full warning of official suspicion that a formal arrest provides, [the defendant] was sufficiently apprised of his suspected role in the crime to motivate him to attempt to destroy what evidence he could without attracting further attention. Testimony at trial indicated that after he refused to consent to the taking of fingernail samples, he put his hands behind his back and appeared to rub them together. He then put his hands in his pockets, and a 'metallic sound, such as keys or change rattling' was heard. The rationale of *Chimel*, in these circumstances, justified the police in subjecting him to the very limited search necessary to preserve the highly evanescent evidence they found under his fingernails.

*Id.* at 296. The Court found *Schmerber v. California*, 384 U.S. 757, 770-71 (1966), somewhat analogous, a case discussing the exigent-circumstances exception to the warrant requirement based on the destruction of evidence.

The warrant exception established in *Cupp* could be read narrowly (for example, as permitting only very limited searches, or applying only when there is actual evidence that the suspect is attempting to destroy evidence). The majority of courts have not so read *Cupp*, however. *See* 3 **Wayne R. LaFave,** *Search and Seizure: A Treatise on the Fourth Amendment* § 5.4(b) (6th ed. 2020). The Eighth Circuit summarized the *Cupp* rule as follows: "A search may be upheld even where there has been no formal arrest, provided there exists probable cause for the search, the intrusion is limited and incident to . . . detention under circumstances which might apprise the defendant of his suspected role in the crime, and the evidence is readily destructible." ***United States v. Lester***, 647 F.2d 869, 873 n.7 (8th Cir. 1981); *accord* **United States v. Pope**, 686 F.3d 1078, 1084 (9th Cir. 2012) (upholding search when defendant was not taken into custody, but "(1) there was probable cause to arrest [the defendant], (2) there was a high risk that evidence would have been destroyed (*i.e.,* an exigent circumstance), and (3) the search was commensurate with the circumstances necessitating the intrusion"). That there must be a risk of destruction of evidence squares with *Roaden v. Kentucky*, 413 U.S. 496, 497-

11

98, 505-06 (1973), in which the Supreme Court rejected the warrantless seizure of an obscene film incident to the theater manager's warrantless arrest, noting that after law enforcement purchased tickets and viewed the film, establishing probable cause, nothing prevented them from obtaining a warrant; the circumstances were not "now or never."

Here, I recommend finding that the search of Schneiders's person comported with the Fourth Amendment. Schneiders knew that law enforcement suspected him of possessing drugs. He also likely suspected that they knew about the planned drug deal. Although law enforcement did not mention the information from the CS, four officers were immediately on the scene, suggesting they were investigating more than a report of a suspicious vehicle. In addition, it was Schneiders's first time dealing with the CS, making it more likely he would suspect the CS was working with law enforcement. During the encounter, Schneiders was agitated, and he put up some resistance to being handcuffed. Under these circumstances, there was a high risk that Schneiders would destroy the drugs or delete the messages on his phone if the evidence was not seized (and officers knew from Schneiders's messages to the CS that Schneiders used the phone to coordinate the planned drug sale).[7] In addition, law enforcement would probably not have another opportunity to catch Schneiders in possession of drugs, since Schneiders was an unknown target prior to that day, and he likely would refuse to work with the CS again after his encounter with law enforcement. And although Officer Gill could have begun to prepare a warrant when he learned of the drug deal earlier in the day from the

---

[7] I further note that Defendant argued law enforcement should have been required to obtain a warrant prior to seizing the phone, given the length of time it took law enforcement to ultimately obtain a search warrant for the phone. But a warrantless seizure of a cell phone, legal at its inception, can be rendered unreasonable if officers delay obtaining a warrant to search the phone. *See **United States v. Escobar***, No. 15-CR-260 (PAM/TNL), 2016 WL 3676176, at *4-5 (D. Minn. July 7, 2016), *aff'd,* 909 F.3d 228 (8th Cir. 2018). Thus, other constitutional safeguards are in place to prevent unreasonably long seizures. That issue was not raised by Schneiders, other than during brief comment during argument at the suppression hearing.

CS, the details of the meeting location and Schneiders's involvement were not revealed until about thirty minutes prior to the stop, a tight window for obtaining a warrant.

Because there was probable cause to believe Schneiders possessed methamphetamine with the intent to sell, law enforcement could search his person for evidence related to that crime. To hold that the search would have been lawful if officers had taken Schneiders into custody—which they could have done—but not otherwise "would have the perverse effect of" encouraging the government to "impos[e] a greater intrusion on [a suspect's] freedom" to comply with the Fourth Amendment. *United States v. Welch*, No. 2:12-CR-68-DBH-05, 2013 WL 159317, at *3 n.4 (D. Me. Jan. 15, 2013); accord *Com. v. Washington*, 869 N.E.2d 605, 615 (Mass. 2007) ("Requiring police to arrest a suspect to justify a search would paradoxically 'turn an arrest into a constitutional safeguard' against warrantless searches." (quoting *Commonwealth v. Feyenord*, 815 N.E.2d 628, 636 (Mass. App. Ct. 2004))). I recommend upholding the warrantless search of Schneiders's person. *See Pope*, 686 F.3d at 1084 (upholding warrantless search of person without arrest when officer had probable cause to believe that defendant possessed marijuana; defendant "knew he was under suspicion, and the pocket-sized amount of marijuana that [the officer] suspected him of possessing could have easily gone 'up in smoke' if [the defendant] had the chance to dispose of it"; and the search was "minimally intrusive"—the officer ordered the defendant to empty his pockets); *see also United States v. Hall*, 739 F.2d 96, 99-100 (2d Cir. 1984) (upholding search when officer had probable cause to believe that defendant customs agent had stolen money during an inspection, and the officer asked the defendant to produce the money she possessed, but ultimately, did not arrest her until a month later; the court noted the officer had "ample reason to secure [the money] before [the defendant] was able to dispose of it"); *United States v. Juarez*, 573 F.2d 267, 272, 274-76 (5th Cir. 1978) (upholding warrantless search of defendant's person without arrest when law enforcement had probable cause defendant possessed drug-sale proceeds; law enforcement could not

13

have obtained a warrant beforehand because probable cause did not exist until defendant accepted the money; and defendant likely would have fled or disposed of the money in the time it took law enforcement to obtain a warrant); *Washington*, 869 N.E.2d at 610-15 (upholding warrantless search of defendants without arrest when law enforcement had probable cause defendants had just participated in an undercover drug purchase and "were now carrying the money from this transaction"; the court reasoned that the money would never have been found if officers did not search immediately, and defendants had not been known to law enforcement prior to the purchase, making it impractical for law enforcement to obtain a warrant beforehand).[8]

### III. CONCLUSION

I respectfully recommend that the district court **deny** Defendant's motion to suppress evidence (Doc. 24).

Objections to this Report and Recommendation, in accordance with 28 U.S.C. § 636(b)(1), Federal Rule of Criminal Procedure 59(b), and Local Criminal Rule 59, must be filed within fourteen days of the service of a copy of this Report and Recommendation; any response to the objections must be filed within seven days after service of the objections. A party asserting such objections must arrange promptly for the transcription of all portions of the record that the district court judge will need to rule on the objections. **LCrR 59**. Objections must specify the parts of the Report and

---

[8] *Cf. Bennett v. City of Eastpointe*, 410 F.3d 810, 824 (6th Cir. 2005) (holding that although officer could have arrested plaintiffs for "riding double" on bikes, they did not, and the officers could not search the plaintiffs incident to arrest; officers had no reason to believe relevant evidence would be found on plaintiffs' persons and destroyed if not seized, unlike here); *Menotti v. City of Seattle*, 409 F.3d 1113, 1127-28, 1153-54 & n.74 (9th Cir. 2005) (holding seizure of protester's sign could not be upheld as search incident to arrest when protester was not arrested, despite the existence of probable cause he was engaged in an illegal protest; officer did not obtain basic information necessary to arrest protester at a future date, such as protester's name; and no exigency existed).

Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* **Fed. R. Crim. P. 59**. Failure to object to the Report and Recommendation waives the right to de novo review by the district court of any portion of the Report and Recommendation, as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

      **ENTERED** this 4th day of November, 2020.

*Kelly K.E. Mahoney*
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa